# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-333


**JERRY NOE**

**VERSUS**

**BASILE POLICE DEPARTMENT, ET AL.**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - DISTRICT 4
PARISH OF ACADIA, NO. 10-05387
SHARON MORROW, WORKERS' COMPENSATION JUDGE

**\*\*\*\*\*\*\*\*\*\***

## MARC T. AMY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Marc T. Amy, and Phyllis M. Keaty, Judges.

**REVERSED.  JUDGMENT RENDERED AND REMANDED FOR FURTHER PROCEEDINGS.**

**James L. Daniels**
**110 E. Kaliste Saloom Road, Suite 210**
**Lafayette, LA   70508**
**(337) 706-8931**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Jerry Noe**

**Christopher R. Philipp**
**Post Office Box 2369**
**Lafayette, LA   70502-2369**
**(337) 235-9478**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **Risk Management, Inc.**
     **Town of Basile Police Department**

**AMY, Judge.**

After being involved in a foot chase, the claimant, a sergeant with the Basile Police Department, had an episode of ventricular tachycardia. He was transported to the emergency room and stabilized. Because of the high risk of recurrence, the claimant subsequently had a defibrillator implanted. The claimant sought workers' compensation benefits, which were denied by his employer's workers' compensation carrier. After a hearing, the workers' compensation judge found that this was an uncompensable heart-related injury and dismissed the claimant's case. This appeal follows. For the following reasons we reverse, render judgment, and remand for further proceedings.

## Factual and Procedural Background

The claimant, Jerry Noe, was a sergeant in the Basile Police Department. According to the record, on February 9, 2010, Mr. Noe initiated a traffic stop after receiving a tip that one of the vehicle's occupants, one Brandon Ceasar, was carrying narcotics. When Mr. Ceasar attempted to flee, Mr. Noe and another officer, Rick Brown, chased him on foot until they were able to subdue him. According to Mr. Noe, after the foot chase he felt "out of breath." When he was unable to get his breath back, he went back to the police station.

An ambulance was called for Mr. Noe and he was transported to the emergency room. According to Mr. Noe's medical records, he was diagnosed with ventricular tachycardia. Mr. Noe was eventually cardioverted, or shocked, to a normal sinus rhythm. Once Mr. Noe was stabilized, he was transferred to the Lafayette Heart Hospital, where a cardiac catheterization revealed evidence of a previous heart attack, including a large left ventricular aneurysm.[1] On the advice of his physicians, Mr. Noe had a defibrillator implanted the next day. As a result of his condition, Mr. Noe's

---

[1] Mr. Noe's aneurysm is also referred to in the record as an inferobasilar aneurysm.

cardiologist and his cardiac electrophysiologist have stated that Mr. Noe should not return to police work.

Mr. Noe sought workers' compensation benefits, which were denied by the employer's workers' compensation carrier on the basis that this was an uncovered heart injury. Mr. Noe filed a disputed claim for compensation, seeking wage benefits, medical benefits, a determination of his disability status, and subrogation to his private insurer, Blue Cross / Blue Shield. After a hearing, the workers' compensation judge found that the physical exertion from the foot chase triggered Mr. Noe's episode of ventricular tachycardia, but that it did not cause the damage which required him to have a defibrillator and which prevented him from returning to work. Further, the workers' compensation judge found that the foot chase was "unusual but not extraordinary" and was thus not a compensable heart-related injury as contemplated by the workers' compensation statutes. Accordingly, the workers' compensation judge dismissed Mr. Noe's claim.

Mr. Noe now appeals, asserting that:

I. The Trial Court committed reversible error in finding that Mr. Noe's burden of proof under La. R.S. 23:1021(7)(e) [sic] requires that Mr. Noe prove that his heart related injury was caused by physical work, stress, or exertion which went "<u>beyond what is unusual</u>".

II. The Trial Court erred in holding that although Sgt. Noe's physical exertion in chasing down a suspect increased the physical stress on Sgt. Noe's heart[,] which "triggered the arrhythmia[,]" the exertion did not cause his injury.

III. The Trial Court erred in not awarding medical expenses incurred by Sgt. Noe and his private healthcare provider, BlueCross/BlueShield of Louisiana and in not awarding Sgt. Noe attorney's fees.

2

**Discussion**

*Standard under La.R.S. 23:1021(8)(e)*

In his first assignment of error, Mr. Noe contends that the workers'

compensation judge erred in requiring him to prove that his heart-related injury was

caused by physical work, stress, or exertion which went "beyond what is unusual." In

*Evans v. Lungrin*, 97-541, pp. 6-7 (La. 2/6/98), 708 So.2d 731, 735, the supreme court

discussed appellate review in cases where legal error is alleged, stating:

> It is well-settled that a court of appeal may not set aside a trial
> court's or a jury's finding of fact in the absence of "manifest error" or
> unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844
> (La.1989). However, where one or more trial court legal errors interdict
> the fact-finding process, the manifest error standard is no longer
> applicable, and, if the record is otherwise complete, the appellate court
> should make its own independent *de novo* review of the record and
> determine a preponderance of the evidence. *Ferrell v. Fireman's Fund
> Ins. Co.*, 94-1252 (La. 2/20/95); 650 So.2d 742, 747, *rev'd in part, on
> other grounds*, 96-3028 (La. 7/1/97); 696 So.2d 569, *reh'g denied*, 96-
> 3028 (La. 9/19/97); 698 So.2d 1388. A legal error occurs when a trial
> court applies incorrect principles of law and such errors are prejudicial.
> *See Lasha v. Olin Corp.*, 625 So.2d 1002, 1006 (La.1993). Legal errors
> are prejudicial when they materially affect the outcome and deprive a
> party of substantial rights. *See Lasha*, 625 So.2d at 1006. When such a
> prejudicial error of law skews the trial court's finding of a material issue
> of fact and causes it to pretermit other issues, the appellate court is
> required, if it can, to render judgment on the record by applying the
> correct law and determining the essential material facts *de novo*. *Lasha*,
> 625 So.2d at 1006.

Generally, an employee is entitled to compensation benefits if he proves by a

preponderance of the evidence that he incurred a personal injury from an accident

arising out of and in the course of his employment. La.R.S. 23:1031(A); *Fontenot v.

Pyramid Alloys, Inc.*, 03-1743 (La.App. 3 Cir. 5/12/04), 872 So.2d 1269. However,

with regard to heart-related or perivascular injuries, the legislature altered those

requirements by enacting La.R.S. 23:1021(7)(e). That statute, which is currently

renumbered as La.R.S. 23:1021(8)(e),[2] states:

> **(e) Heart-related or perivascular injuries.** A heart-related or perivascular injury, illness, or death shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence that:
>
> (i) The physical work stress was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation, and
>
> (ii) The physical work stress or exertion, and not some other source of stress or preexisting condition, was the predominant and major cause of the heart-related or perivascular injury, illness, or death.

The supreme court addressed the interpretation of this statute in *Harold v. La Belle Maison Apartments*, 94-889 (La. 10/17/94), 643 So.2d 752. With regard to the requirement that physical work stress be "extraordinary and unusual," the supreme court examined the definitions of those two words and concluded that they have "similar meanings." *Id.* at 755. Thus, the supreme court held that "these terms require plaintiff to prove that her physical work stress went beyond what was usual, regular or customary in relation to the average employee in that occupation." *Id.*

In this case, the workers' compensation judge issued oral reasons for ruling. Therein, the workers' compensation judge discussed the supreme court's opinion in *Harold* and this court's ruling in *Estate of St. André v. Frey*, 96-711 (La.App. 3 Cir. 12/18/96), 685 So.2d 604, stating:

> If you're going beyond what is usual, foot pursuit is beyond usual. If you are going beyond what is unusual, foot pursuit is not extraordinary.
>
> So there was a difference in the quotes, so I just pulled my dictionary off my office shelf, which is a Webster's New College Dictionary. It gives the first definition, "not according to the usual custom or regular plan"; two, ["]going far beyond the ordinary degree, measure limit, etcetera, very unusual, exceptional, remarkable." This would appear to indicate that the *Estate of St. Andre* quote by the Third Circuit is the correct reading; that extraordinary requires going beyond

---

[2] *See, e.g., Smith v. Kinder Ret. & Rehab. Ctr.*, 06-1480 (La.App. 3 Cir. 4/4/07), 954 So.2d 365.

4

what is unusual. There is an additional element of intensity in its unusualness and making that finding, I would have to say that the activities Mr. Noe was engaged in were unusual but not extraordinary.

In *Estate of St. André*, 685 So.2d 604, a panel of this court found that the estate of a farm worker was not entitled to compensation after the farm worker suffered a fatal heart attack. In so doing, this court quoted *Harold* as defining "extraordinary" as "beyond what is *unusual*." (Emphasis added.) *Estate of St. André*, 685 So.2d at 606. However, in *Harold*, the supreme court defined "extraordinary" as "going beyond what is *usual*, regular, or customary." (Emphasis added.) *Harold*, 643 So.2d at 755. Further, other decisions from this circuit have found that "'[o]rdinary' and 'usual' are synonyms, and 'extraordinary' and 'unusual' also mean about the same thing. Webster's defines 'extraordinary' as 'going beyond what is usual, regular or customary.'" *Johnson v. Petron, Inc.*, 617 So.2d 1358, 1361 (La.App. 3 Cir.), *writ denied*, 623 So.2d 1338 (La.1993). *See also City of Oakdale v. Smith*, 00-1792 (La.App. 3 Cir. 5/2/01), 788 So.2d 507, *writ denied*, 01-1596 (La. 9/14/01), 796 So.2d 685.[3]

Thus, we find that the workers' compensation judge erred in requiring Mr. Noe to prove that his physical work stress was "beyond unusual." Accordingly, we review the record de novo. *Evans*, 708 So.2d 731.

*Entitlement to Benefits*

Mr. Noe's amended disputed claim for compensation seeks wage benefits, medical benefits, a determination of his disability status, and subrogation to his private insurer, Blue Cross / Blue Shield.

Because Mr. Noe's alleged injury, ventricular tachycardia, is a heart-related

---

[3] We note that our sister circuits have also made similar observations concerning the definitions of "extraordinary and unusual." *See Brown v. Imperial Trading Co.*, 01-1889 (La.App. 4 Cir. 4/3/02), 815 So.2d 1084, *writ denied*, 02-1242 (La. 8/30/02), 823 So.2d 951; *Gooden v. B E & K Const.*, 33,457 (La.App. 2 Cir. 6/23/00), 764 So.2d 1206.

injury, we must analyze his claim within the confines of La.R.S. 23:1021(8)(e). Accordingly, Mr. Noe must first prove by clear and convincing evidence that his "physical work stress went beyond what was usual, regular or customary in relation to the average employee in that occupation." *Harold*, 643 So.2d at 755. *See also* La.R.S. 23:1021(8)(e). However, that requirement does not mean that "the job duty being performed be a duty outside of the employee's job description." *City of Oakdale*, 788 So.2d at 512.[4]

In *City of Oakdale*, a police investigator's family sought death benefits after he suffered a fatal cardiac event during a high-speed car chase. *City of Oakdale*, 788 So.2d 507. In upholding the workers' compensation judge's award of those benefits, a panel of this court discussed whether the car chase resulted in physical work stress that was extraordinary and unusual. *Id*. at 511. The record in that case revealed that the investigator was not a "line officer" and was not normally expected to subdue or chase suspects, whether on foot or in a car. *Id.* Further, there was testimony that a high-speed chase, especially one of this length, was a rare occurrence, even for the line officers. *Id.* Two police lieutenants testified to the rarity of such chases, with one lieutenant testifying that in seven or eight years he had engaged in approximately fifteen high speed car chases. *Id.* Accordingly, this court found that "the evidence clearly and convincingly establishes that a high speed chase was 'extraordinary and unusual' physical work stress." *Id.* at 512.

In this case, the record indicates that Mr. Noe was a sergeant in the Basile

---

[4] *See also Smith*, 954 So.2d 365 (A panel of this court found that, where a certified nursing assistant was required to singlehandedly transport a handicapped and disoriented nursing home resident to a doctor's appointment and, after an incident in the waiting room, singlehandedly clean excrement from the resident, this constituted extraordinary and unusual circumstances.); *Richardson v. City of New Orleans (Police Dept.)*, 03-2211 (La.App. 4 Cir. 12/1/04), 890 So.2d 661 (The claimant, a brake inspector for the police department, suffered a heart attack while inspecting the air brakes on a bus. Given testimony that air brakes were significantly more difficult to manipulate and that claimant had only inspected the brakes on three other buses during his employment, the fourth circuit found that the claimant met his burden of proving that the physical work stress was extraordinary and unusual.).

Police Department. Mr. Noe's job description was "the senior patrol officer[,]" and "[h]is duties are to provide proper supervision of patrolmen whenever he is ranking officer, and to ensure the proper maintenance and upkeep of vehicles and equipment." Allen Ivory, the Chief of Police, testified that Mr. Noe did everything that a patrolman does, in addition to supervisory duties. Chief Ivory testified that he had been the chief of police for twenty-one years. According to his testimony, it was "not unusual" for an officer to be involved in a foot chase. However, he also testified that he has been involved in "more than ten" foot chases over the course of his law enforcement career. Chief Ivory estimated that approximately ten percent of all arrestees resist arrest in some fashion and that five percent of that ten percent flee on foot.

Mr. Noe testified that, to the best of his memory, only six people have fled on foot during the nine years he was employed with the Police Department. He also testified that he tries to cut people off with his police car rather than chase them on foot. Mr. Noe estimated that, because of this, he has only had to chase two people on foot during his employment with the Police Department. Further, Mr. Noe estimated that one in one hundred people physically resist arrest. Officer Rick Brown, who was also involved in the foot chase, testified that he has been employed with the Police Department for two years. According to his testimony, Officer Brown has chased suspects on foot approximately eight times since he began his employment with the Police Department, although he conceded that that number was "just a guess." Officer Brown testified that he normally pursues suspects on foot and not in his police car.

With regard to the foot chase, Mr. Noe testified that he pulled over Mr. Ceasar's vehicle and ordered him out of the car. According to Mr. Noe, after he informed Mr. Ceasar why they pulled him over, Mr. Ceasar "c[a]me unglued" and started running. Mr. Noe noted that he was concerned that Mr. Ceasar was armed.

7

Mr. Noe chased Mr. Ceasar and attempted to use his Taser on him, to no avail. However, according to the testimony, Officer Brown was able to spray Mr. Ceasar with pepper spray and the two officers successfully subdued Mr. Ceasar at that point.

Mr. Noe stated that he first noticed his symptoms immediately after the chase. Mr. Noe also testified that he paced off the length of the chase and estimated that it was about 200 yards. However, Officer Brown testified that he later used a rolling measuring device and determined that the distance was about 89 yards. Officer Brown, when discussing his search for contraband that Mr. Ceasar was thought to have thrown in the grass during the chase, also testified that there was "ice on the ground" that night.

The evidence presented indicates that Mr. Noe, as sergeant, was a patrol officer with additional supervisory duties. Unlike the police investigator in *City of Oakdale*, 788 So.2d 507, it was expected that he subdue or chase suspects when necessary. However, even though Mr. Noe's job duties as the senior patrol officer included chasing suspects on foot, the testimony in this case indicates that a foot chase is "extraordinary and unusual in comparison to the stress or exertion experienced by the average employee" in Mr. Noe's occupation as a sergeant in the Basile Police Department. Further, we note that awards of workers' compensation benefits have been upheld in cases where, even though the physical work stress was the result of duties within the claimant's job description, the specific facts of each case indicated that the physical work stress was extraordinary and unusual. *See*, *e.g.*, *City of Oakdale*, 788 So.2d 507; *Kinder*, 954 So.2d 365; *Richardson*, 890 So.2d 661.

The employer argues, in part, that because fleeing from the police is a type of resisting arrest, that such activity is not extraordinary and unusual. The testimony indicated that a maximum of ten to fifteen percent of arrestees physically resist arrest in some fashion. However, even if we were to accept this distinction, the employer

8

did not present evidence that the physical work stress caused by other types of resisting arrest was similar to or more physically stressful than that caused by chasing a potentially armed suspect on foot. Accordingly, we find that, based on this record, Mr. Noe proved by clear and convincing evidence that the physical work stress caused by the foot chase "went beyond what was usual, regular or customary in relation to the average employee in that occupation." *Harold*, 643 So.2d at 755. *See also City of Oakdale*, 788 So.2d 507.

The second element that Mr. Noe must prove by clear and convincing evidence is that "[t]he physical work stress or exertion, and not some other source of stress or preexisting condition, was the predominant and major cause of the heart-related or perivascular injury[.]" La.R.S. 23:1021(8)(e)(ii).

The record indicates that Mr. Noe was diagnosed, in part, with ventricular tachycardia. According to Mr. Noe's cardiac electrophysiologist, Dr. William Bailey, ventricular tachycardia is a rapid heart rate in the ventricle. However, after Mr. Noe's cardiologist, Dr. Christopher Mallavarapu, performed a cardiac catheterization, he discovered that Mr. Noe had a large inferobasilar aneurysm. Dr. Mallavarapu testified at his deposition that this was a portion of the heart wall muscle that had been damaged by an old heart attack. In his deposition, Dr. Bailey explained that the aneurysm was the "substrate" that allowed the episode of ventricular tachycardia to occur. According to Dr. Bailey, although he could not definitively say that the physical stress of chasing Mr. Ceasar caused Mr. Noe's arrhythmia, he testified that exercise was one way to trigger an arrhythmia and that "[i]f you had to ask me if running and chasing someone down triggered the arrhythmia, then I would say yes." Similarly, Dr. Mallavarapu testified that the aneurysm and the scar tissue were "the big contributory factor" to the episode of ventricular tachycardia. Dr. Mallavarapu also testified that it was highly likely that the stress of that night is what triggered Mr.

9

Noe's cardiac event.

The employer contends that Mr. Noe's preexisting aneurysm and coronary artery disease are the predominant and major cause of his episode of ventricular tachycardia. According to Mr. Noe, he had no knowledge of any previous cardiac events. Mr. Noe's medical records indicate that he had previously been treated for hypertension. Mr. Noe also testified that he was sufficiently physically fit to participate in specialized S.W.A.T. training. The employer argues that Mr. Noe's physicians could not definitively state that the physical exertion from the foot chase triggered the arrhythmia. Further, they point out that the testimony was that the arrhythmia could not have occurred absent Mr. Noe's underlying heart problems. In *Harold*, the supreme court observed that recovery under La.R.S. 23:1021(8)(e) is not precluded simply because the claimant has a previously unknown heart disease. *Harold*, 643 So.2d 752. Further, the supreme court rejected the contention that a claimant's case would fail "simply because the medical expert cannot definitively state what the primary cause of the heart attack was." *Id.* at 757. Of particular note, Mr. Noe testified that he had never had any heart symptoms or complaints before this incident and that he first noticed his symptoms immediately after the foot chase.

On his physicians' advice, Mr. Noe had a cardiac defibrillator implanted because of the high risk that the arrhythmia would recur. Dr. Bailey also recommended that Mr. Noe consult another doctor about having the aneurysm resected, although the record indicates that Mr. Noe declined to have any further surgeries. Dr. Bailey testified that, as of the time of his deposition, Mr. Noe's defibrillator had not recorded any further arrhythmias. However, although Dr. Bobby Deshotels, the doctor hired by the employer, felt that Mr. Noe could return to police work, both Dr. Bailey and Dr. Mallavarapu testified at their depositions that Mr. Noe

should not return to police work.[5] Dr. Bailey in particular testified that Mr. Noe would be able to return to work in a different occupation but that, were an episode to occur while he was on duty, it could result in danger to Mr. Noe or other people.

Given this evidence, particularly the testimony of Dr. Bailey and Dr. Mallavarapu, Mr. Noe proved by clear and convincing evidence that the predominant and major cause of his episode of ventricular tachycardia was the physical stress of the foot chase. Therefore, we find that Mr. Noe proved that he suffered a compensable heart-related injury, more specifically, the episode of ventricular tachycardia that he was treated for on February 10, 2010.[6]

*Medical Expenses*

Mr. Noe also contends that he is entitled to reimbursement for his medical expenses. Having found that Mr. Noe incurred a compensable heart-related injury, we find that he is entitled to reimbursement of his medical expenses. However, the evidence submitted indicates that the only injury attributable to the foot chase was ventricular tachycardia. The implantation of the defibrillator is attributable to his underlying heart condition, e.g., the inferobasilar aneurysm. The record indicates that it is the increased risk of arrhythmia due to the aneurysm that prevents Mr. Noe from returning to police work, not his episode of ventricular tachycardia. Accordingly, we find that the employer is only responsible for the treatment which resolved Mr. Noe's episode of ventricular tachycardia. *See Richardson*, 890 So.2d 661. Therefore, we remand to the workers' compensation court for a determination of which medical expenses are a direct result of Mr. Noe's episode of ventricular tachycardia. In making that determination, the workers' compensation judge is directed to consider

_____

[5] According to the record, Dr. Mallavarapu signed a work release slip in April of 2010. However, he later testified that he recommends that Mr. Noe should not return to a job which would require physical activity.

[6] Although Mr. Noe testified that his symptoms began after the foot chase, which occurred on February 9, 2010, the record indicates that an ambulance was not called until 12:43 a.m. on February 10, 2010.

11

the amount of subrogation due to Blue Cross / Blue Shield pursuant to La.R.S. 23:1212 and La.R.S. 23:1205.

*Attorney Fees*

Mr. Noe contends that the workers' compensation judge erred in failing to award him attorney fees. He also requests additional attorney fees for work performed on appeal. Louisiana Revised Statutes 23:1201 provides for the imposition of penalties and attorney fees; however, such an award is not warranted if the claim is reasonably controverted. *See Stenson v. Pat's of Henderson Seafood*, 11-1148 (La.App. 3 Cir. 2/1/12), 84 So.3d 661, *writ denied*, 12-504 (La. 4/13/12), 85 So.3d 1253. Attorney fees for additional work done on appeal is warranted when the appeal requires additional work on the part of the claimant's attorney. *Rivera v. M & R Cable Contractors, Inc.*, 04-985 (La.App. 3 Cir. 12/15/04), 896 So.2d 90.

Typically, appellate attorney fees are requested in cases where the claimant defends an employer's unsuccessful appeal. *See, e.g., Ware v. Mitchell*, 05-1289 (La.App. 3 Cir. 4/12/06), 928 So.2d 699; *Strother v. Guinn Oilfield Servs., L.L.C.*, 03-1310 (La.App. 3 Cir. 3/3/04), 867 So.2d 113. Further, "[g]enerally, when an award for attorney's fees is granted at the trial level, additional attorney's fees are proper for work done on appeal. This is to keep the appellate judgment consistent with the underlying judgment." *Wilczewski v. Brookshire Grocery Store*, 08-718, p. 18 (La.App. 3 Cir. 1/28/09), 2 So.3d 1214, 1226, *writ denied*, 09-456 (La. 4/13/09), 5 So.3d 170. In this case, although Mr. Noe successfully prosecuted his appeal, we find that the employer reasonably controverted his claim and that Mr. Noe would not be entitled to attorney fees under La.R.S. 23:1201. Accordingly, we decline to award attorney fees for work done on appeal.

**DECREE**

For the foregoing reasons, we reverse the judgment of the workers' compensation court. We render judgment in favor of the claimant, Jerry Noe, finding that his episode of ventricular tachycardia, for which he was treated on February 10, 2010, was a compensable heart-related injury. We award him medical benefits attributable to that episode. We remand to the Office of Workers' Compensation for a determination of which medical expenses are attributable to the episode of ventricular tachycardia. Costs of this proceeding are allocated to the employer, the Basile Police Department.

**REVERSED. JUDGMENT RENDERED AND REMANDED FOR FURTHER PROCEEDINGS.**